Fabricant, J.
INTRODUCTION
This action to stay arbitration pursuant to G.L.c. 251, §2(b), arises from a set of agreements relating to the plaintiffs tenancy in a residential rental apartment building operated by the defendant. The defendant landlord seeks to enforce an arbitration provision; the plaintiff tenant contends that enforcement of the arbitration provision would violate his rights under state and federal law. The parties agree that no genuine dispute of material fact exists, and that the dispute is ripe for judgment as a matter of law. For the reasons that will be explained, judgment will enter in favor of the defendant.
BACKGROUND
The record provided in connection with the present cross motions presents the following factual back *24 ground.[1] The plaintiff, Myron Patterson, is a tenant in a rental apartment building, located at 791 Tremont Street in Boston, owned by the defendant Piano Craft Guild Associates (“Piano Craft”). Piano Craft spends in excess of half a million dollars annually purchasing goods and services in interstate commerce in connection with the operation of the building. Tenants of the building, including the plaintiff, are organized as the Piano Craft Guild Tenants Association, Inc. The plaintiff, as well as some but not all of the other tenants, receives- a rental subsidy under the federal section 8 program, which is administered by the Boston Housing Authority. Pursuant to regulations applicable to that program, his tenancy is governed by a section 8 lease agreement.
On July 1, 1998, the Tenants’ Association and its members, including the plaintiff, entered into an agreement with Piano Craft. The agreement resulted from extensive negotiation, in which both sides were represented by counsel, and was achieved with the assistance of former Supreme Judicial Court Chief Justice Edward F. Hennesey as mediator.[2] The agreement gave each tenant the option of remaining in the building through the year 2014, at rent not to exceed thirty-five percent of the tenant’s income, subject to certain conditions. Among the conditions was that, upon request and subject to certain exceptions and procedural requirements, the tenant would accept transfer to a unit of lesser market value. Article 7.6 of the agreement provides that, “A Tenant shall have the right to reject one unit otherwise meeting the requirements of this Article to which a transfer is proposed; the rej ection of a second qualifying unit, however, may, at the Landlord’s option, result in eviction from the Property.”
The 1998 agreement provides, in Article 2.3, that, “Tenants shall occupy their premises under leases in the form attached to this Agreement as Exhibit C, provided that Subsidized Tenants shall occupy the premises under such other leases or lease addenda as may be required by the programs rules of a Rental Assistance Program. In the event of any conflict or inconsistency between the terms of this Agreement and the provisions of the Lease form, the terms of the Agreement shall govern, except where the terms of the Agreement are preempted by federal or state law applicable to a Rental Assistance Program.” Appended to the 1998 agreement as Exhibit C was a Greater Boston Real Estate Board standard form apartment lease, modified to be consistent with, and to incorporate, the terms of the agreement.
Article 12 of the 1998 agreement addresses dispute resolution. Article 12.1 provides that “Disputes arising under this Agreement shall be subject to arbitration in Boston pursuant to the Commercial Arbitration Rules of the American Arbitration Association.” Article 12.3 clarifies that “Nothing in this Agreement shall deprive the Landlord or Tenants from exercising their statutory or common law rights which exist independent of the terms of this Agreement in the usual manner or seeking to enforce or protect their rights in any Court of competent jurisdiction, except that any dispute requiring the interpretation or application of this Agreement in the context of such proceeding shall be referred to arbitration.” In Article 13.5, the parties agree to observe, and agree that the agreement “shall be construed in conformity with, all applicable state and federal fair housing laws,” specifically including the federal Rehabilitation Act and G.L.c. 15IB.
Under the terms of the agreement, on May 31,1999 Patterson and his co-tenant elected to extend their lease through the end of 2014. They entered into a lease agreement, in the form appended to the 1998 agreement, with a section 8 lease rider. The rider contained the parties’ acknowledgment that “they have executed and are bound by the provisions of’ the 1998 agreement, and of their intention to “clarify and harmonize” the provisions of the various agreements between them. The rider further provided, in paragraph 11, that “The Tenant and the Owner stipulate and agree that there is no conflict between the provisions of this Section 8 Lease Rider, including the GBREB [Greater Boston Real Estate Board] Lease, GBREB Addendum and [1998] Articles of Agreement, and the [section 8] HUD Addendum.” The section 8 addendum provides, at paragraph 8(d), that “The owner may only evict the tenant by a court action.” Paragraph 14(b) of the addendum provides that “In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any qther provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.”[3]
The events giving rise to the present dispute began with a letter from the landlord, dated January 22, 2001, requesting that Patterson and his co-tenant transfer from unit W-511, which they then occupied, to unit E-317, effective February 23, 2001. Patterson responded, by letter dated February 22, 2001, expressing his understanding that “the tenant above this unit (E417) has a contractual agreement with management, that the new tenant cannot be a smoker,” and stating that “If this is the case, I do smoke cigarettes and it will be a major inconvenience to my living situation.” The landlord wrote back, characterizing Patterson’s response as a refusal to transfer, informing him that no such agreement with the tenant above existed, and asking that he contact management immediately “with your final decision in the matter.” Patterson responded, by letter dated March 2, 2001, declining the transfer, giving as his reason that “The unit has veiy little to no living room or dining room space, and I would not have any room for creating my artwork.”
There followed a letter from Patterson’s present counsel, dated April 4, 2001, asserting that Patterson *25 “is a handicapped person” within the meaning of specified state and federal statutes, and “is therefore entitled to the protections of federal and state housing discrimination laws.” The letter asserted that Patterson “suffers from depression,” that a transfer “would jeopardize his health and well-being,” and that he therefore requested that the landlord “provide Mr. Patterson with a reasonable accommodation of his disability by permitting him to remain in Unit W511.”
The landlord responded by letter from its counsel dated April 6, 2001. Counsel questioned the good faith of Patterson’s claim of disability, in light of his previously expressed reasons for declining the transfer, but nevertheless expressed willingness to look into the claim, by requesting “detailed documentation of Mr. Patterson’s asserted disability, and of your conclusion that his move from their current unit to Unit E-317 would jeopardize his health and well-being.” Counsel also proposed a meeting “in a good faith attempt to reach a mutually acceptable resolution.” Patterson’s counsel responded, by letter dated April 10, 2001, promising documentation and agreeing to schedule a meeting, while asserting the position that the disability claim arose not under the 1998 agreement, but from independent statutory sources.
Apparently neither documentation[4] nor a negotiated resolution ensued, although the parties did engage together in an effort to obtain enhanced vouchers from the Department of Housing and Urban Development, which would have increased rents received by the landlord for subsidized tenants, obviating the basis for transfers. That effort apparently did not succeed, and by letter dated July 25, 2001, the landlord requested that Patterson and his co-tenant transfer to Unit W-208, effective August 31,2001. The letter announced that “this is the second Notice of the Landlord’s intention to transfer you, the first Notice having been rejected by you on March 2, 2001.” Patterson’s response came in the form of a letter from his counsel, asserting that this second request to transfer, in the face of his request for “reasonable accommodation” of his claimed disability, “constitutes illegal coercion and retaliation under the disability laws, including M.G.L.c. 15IB, §4, and is itself an independent violation of said discrimination laws.” The letter concluded, however, by announcing that “[flor the purposes only of preserving Mr. Patterson’s rights under the Articles of Agreement and without waiving his entitlement to a reasonable accommodation or claims against the Landlord for retaliation, or any other rights or claims he may have, Mr. Patterson accepts the offer to transfer to Unit W208.”
Despite this announcement, however, Patterson and his co-tenant did not make the transfer. The landlord, by letter to the American Arbitration Association dated September 4, 2001, demanded arbitration of the dispute between the parties under the 1998 agreement. The demand specified the relief sought in arbitration as a declaration that the landlord had complied with the agreement, and that the tenants’ failure to transfer “without legal cause” “may, at [landlord’s] option, be cause for [tenants’] eviction from the property.” The landlord’s intention, as expressed in the affidavit of the chief operating officer of its managing agent, is that “if Piano Craft prevails in arbitration, and Patterson does not vacate his unit voluntarily, Piano Craft will bring a summary process action in Housing Court to seek an execution for possession.”
On September 18, 2001, Patterson, through his counsel, filed a charge with the Massachusetts Commission Against Discrimination (“MCAD”), alleging that the landlord had discriminated against him on the basis of disability by denying him reasonable accommodation, and “threatened to and attempted to evict complainant due to his disability.” The date given as that of the discriminatory act was September 4, 2001, the same date as the arbitration demand.
Patterson initiated this action on September 24, 2001. His complaint sought a stay of arbitration, pursuant to G.L.c. 251, §2(b), on the grounds that the arbitration provision violated G.L.c. 186, §15F, and that “Mr. Patterson’s statutory rights under M.G.L.c. 151B are not subject to arbitration.”[5] At Patterson’s request, the Court issued a short order of notice and scheduled ahearing; the hearingwas indefinitely postponed, however, upon notice from plaintiffs counsel of agreement between the parties that “the arbitration proceeding will be held in abeyance until such time as either party requests that the matter be reactivated.” Counsel gave similar notice to the American Arbitration Association, by letter dated September 26, 2001, expressing agreement that “this case and all attendant deadlines and obligations of the parties will be held in abeyance until such time as either party requests that the matter be reactivated.”
On December 19, 2001, the MCAD dismissed Patterson’s claim, at his request, so as to permit him to pursue the claim in Court. To date he has not done so. His counsel’s affidavit indicates that he is “currently considering whether to assert his discrimination claims by filing a complaint in the Superior Court or by asserting them as counterclaims or defenses in eviction proceedings to be initiated by Piano Craft.”
The parties have reactivated the litigation by means of the present cross motions for summary judgment, submitted on June 11, 2002, and heard on September 17, 2002.[6]
DISCUSSION
Summary judgment should be granted where it appears from the pleadings and evidentiary materials offered that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 426 (1995); Cassesso v. *26 Comm'r of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). Summary judgment is a device “to make possible the prompt disposition of controversies on their merits without a trial, if in essence, there is no real dispute as to the salient facts or if only a question of law is involved.” Dawes, 369 Mass. at 553. Where, as here, the parties agree that no genuine dispute exists, and that the only issues presented are ones of law, summaryjudgment is an appropriate means to resolve the dispute promptly.
General Laws c. 251, §2(b), authorizes the Court to “stay an arbitration proceeding commenced or threatened if it finds that there is no agreement to arbitrate.” If it does not so find, the statute provides, “the court shall order the parties to proceed to arbitration.” Both Massachusetts and federal policy strongly favor arbitration. See Drywall Sys., Inc. v. ZVI Constr. Co., 435 Mass. 664, 669 (2002); Ladd v. Scudder Kemper Inv., Inc., 433 Mass. 240, 246 (2001); Home Gas Corp. of Mass., Inc. v. Walter’s of Hadley, Inc., 403 Mass. 772, 774 (1989). That policy amounts, in substance, to a “presumption of arbitrability,” such that “(a]n order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.” Drywall Sys., Inc. v. ZVI Constr. Co., 435 Mass. at 666, quoting Local No. 1710, Int’l Ass’n of Fire Fighters v. Chicopee, 430 Mass. 417, 421 (1999). Here, the undisputed facts leave no doubt that an agreement to arbitrate exists between these parties, and that it encompasses all claims of violation of the 1998 agreement. Nor is there any room for doubt that the issue Piano Craft seeks to arbitrate is such a claim, and therefore falls within the arbitration provision of the agreement.
Nevertheless, Patterson seeks to avoid application of the arbitration provision to which he agreed. He asserts three arguments in support of this effort. First, he contends that the section 8 addendum precludes enforcement of the arbitration provision, by virtue of its provision that “(t]he owner may only evict the tenant by a court action.” Second, he contends that the arbitration provision does not encompass his claim of violation of G.L.c. 151B. And third, he argues that the arbitration provision is unenforceable under G.L.c. 186, §15F, which voids “(a]ny provision of a lease or other rental agreement relating to residential real property whereby the tenant agrees to waive his right to trial by jury in any subsequent litigation with the landlord.” The Court will address these arguments in turn.
1. The Section 8 Addendum
Patterson’s argument based on the section 8 addendum rests solely on paragraph 8(d), which provides that “ [t]he owner may only evict the tenant by a court action.” Patterson argues that this language precludes eviction by arbitration. He relies on Fenelly v. Kimball Court Apartments Ltd. P’ship, 14 Mass. L. Rptr. No. 2, 37 (January 14, 2000) (Burnes, J.). In that case, involving the same section 8 addendum, the Superior Court construed the cited language to invalidate a lease provision that authorized termination of the tenancy, without any court proceeding, when a fire rendered the unit uninhabitable. There, as the Court held, the termination provision on which the landlord relied conflicted with paragraph 8(b), and accordingly had to yield to the latter.
Here, in contrast, no conflict exists. The arbitration provision does not purport to authorize an arbitrator to grant possession, or otherwise to authorize eviction without court action, nor does Rano Craft suggest that it does. Piano Craft fully acknowledges that it cannot gain possession without a summary process action in court. It invokes the arbitration provision as a means to resolve a dispute under the agreement, as to whether Patterson has violated the agreement by refusing to transfer, thus giving Piano Craft ground under the agreement, at its option, to proceed to court to seek eviction. Nothing in the section 8 addendum prevents enforcement of an arbitration agreement for this purpose.
2. The G.L.c. 15 IB Claim
Patterson next contends that his c. 151B claim does not fall within the arbitration provision. The assertion is obviously correct, as far as it goes, but the conclusion Patterson seeks does not follow. The arbitration provision, by its plain terms, encompasses only “(d)isputes arising under this Agreement.” Further, the agreement preserves all parties’ option to exercise independent “statutory and common law rights ... in any Court of competent jurisdiction, except that any dispute requiring the interpretation or application of this Agreement in the context of such proceeding shall be referred to arbitration.” The import of this language is that Patterson was free to bring a c. 15 IB claim before the MCAD, as he did, and that he is now free to bring that claim in court if he chooses to do so, seeking damages or other relief provided by that statute. He has no obligation to bring such a claim in arbitration, nor does Rano Craft contend that he does. But his freedom in that regard has no bearing on Rano Craft’s right, under the agreement, to demand arbitration of its claim that Patterson breached the agreement by refusing to transfer.
In relation to the claim Rano Craft seeks to arbitrate, the relevance of c. 15IB is not so much as a claim, but as a potential defense. That is, Patterson may contend that his refusal to transfer is not a breach of the agreement because c. 15 IB, which is effectively incorporated into the agreement by Article 13.5, gives him a right to so refuse as a means of seeking reasonable accommodation for this alleged disability. Cast in this way, the principle of reasonable accommodation becomes a term of the agreement, subject to interpre *27 tation and application in arbitration. But this reasoning does not eliminate the arbitration provision of the agreement, or preclude its enforcement. If Patterson chooses to assert reasonable accommodation under c. 15 IB as an implicit term of the agreement, so as to form a defense to Piano Craft’s claim, then he must make that argument to the arbitrator, who is empowered to consider it in interpreting the agreement.[7] He need not make that choice; the agreement preserves his right to seek statutory remedies in litigation of his c. 15IB claim. But Piano Craft nevertheless retains its bargained-for right to assert its claim of breach in arbitration.
3. General Laws c. 186, §15F
Patterson’s argument under c. 186, §15F, is considerably stronger than his other arguments. Ultimately, however, the Court concludes that it does not relieve him of his contractual obligation to arbitrate. The statute provides, in pertinent part;
Any provision of a lease or other rental agreement relating to residential real property whereby the tenant agrees to waive his right to trial by juiy in any subsequent litigation with the landlord . . . shall be deemed against public policy and void.
The purpose of this provision is plain from its terms: to ensure that the generally stronger bargaining power of landlords as compared to tenants does not obviate statutory procedural protections for residential tenancies. The arbitration provision does just that, Patterson contends, since it would preclude a jury trial of factual disputes between the parties as to Rano Craft’s claim that Patterson breached the agreement. Thus, he argues, the arbitration provision is void under the statute.
Rano Craft responds first that the arbitration provision falls outside the statutory prohibition because it is not in a “lease or other rental agreement.” It relies on Minassian v. Ogden Suffolk Downs, Inc., 400 Mass 490, 493 (1987), and Thomalen v. Marriott Corp., 845 F.Sup. 33, 37 (D.Mass. 1994). In each of those case, the Court held the statute inapplicable to a contract involving the use of space for purposes outside a traditional residential landlord-tenant relationship; the former case involved lodging for members of a tour group at a hotel, while the latter involved the use of stall space at a race track. Here, in contrast, the relationship between the parties is a traditional residential landlord-tenant relationship. Compare Serreze v. YWCA of W. Mass., Inc., 30 Mass.App.Ct. 639, 642-43 (1991) (applying statute to transitional housing program for battered women, even absent “classic ‘tenancy’ ”). Although the 1998 agreement is not a lease in itself, it bears a close relationship to and indeed incorporates specified lease provisions, and expressly provides for the rental of residential space. Rano Craft’s argument on this point would allow landlords to avoid the statutory prohibition merely by placing the prohibited term in a separate document, bearing a label other than “lease” or “rental agreement.” The legislature cannot have intended such an easy escape. Accordingly, the Court concludes that the 1998 agreement is a “rental agreement” within the meaning of c. 186, §15F.
Rano Craft next argues that the arbitration provision does not conflict with the statute because it does not preclude jury trial; Patterson could still claim a jury in any summary process action that might follow from an arbitration award, although the facts governing such an action would be established by the award, at least with respect to matters arising under the agreement. This argument is correct at least in a procedural sense; nothing in the arbitration provision would directly prevent Patterson from claiming a juiy in a summary process action brought after an arbitration award, and there may be unresolved facts for a juiy to decide, bearing on claims or defenses arising from statutory, common-law, or other sources outside the agreement. Still, this response is less than satisfying. Although some cases involving parties to the agreement might leave facts remaining, the likelihood is that most would present to a jury a set of facts, established by arbitration award, that determine the outcome as a matter of law. The legislative purpose would hardly be met by the procedural formality of a juiy trial, if the jury could not perform its traditional function of finding whatever facts are in dispute. Accordingly, the Court construes c. 186, §15F, as voiding the arbitration provision in the 1998 agreement.
The Court is thus compelled to consider preemption. Section 2 of the Federal Arbitration Act (“FAA”), 9 U.S.C. §2 provides, in pertinent part:
A written provision in any . . . contract evidencing a transaction involving commerce[8] to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof. . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
This provision serves to enforce the strong federal policy in favor of arbitration, and “to overrule the judiciary’s longstanding refusal to enforce agreements to arbitrate.” Weston Sec. Corp. v. Aykanian, 46 Mass.App.Ct. 72, 75 (1998), quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219-20 (1985). The provision also overrules legislative opposition to arbitration agreements, by preempting any statutoiy provision that “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id., quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941). See also Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 122-23 (2001); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270 (1995); Southland Corp. v. Keating, 465 U.S. 1, 12 (1984); KKW Enter., Inc. v. Gloria Jean’s Gourmet *28 Coffees Franchising Corp., 184 F. 3d 42, 50-52 (1st Cir. 1999); Saturn Distrib. Corp. v. Williams, 905 F.2d 719, 724 (4th Cir. 1990); Sec. Indus. Ass’n v. Connolly, 883 F.2d 1114, 1121 (1st Cir. 1989).
A state statute stands as an obstacle to the purposes of the Federad Arbitration Act if it singles out arbitration provisions for disfavored treatment not applied to other contractual terms generally. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. at 281; Saturn Distrib. Corp. v. Williams, 905 F.2d at 724. Similarly, state provisions form an obstacle if they “take their meaning from the fact that a contract to arbitrate is at issue, or frustrate arbitration, or provide a defense to it.” Sec. Indus. Ass’n v. Connolly, 883 F.2d at 1123.
The statutory provision in issue here does not explicitly refer to arbitration agreements, and does not literally single them out. The provision prohibits a small category of contractual provisions in addition to those for arbitration, particularly provisions waiving jury trial, and those calling for some form of alternative dispute resolution other than arbitration. Insofar as it voids arbitration agreements, however, while leaving intact other aspects of rental agreements, the provision does not treat arbitration clauses equally with other contract terms. In that respect, it clearly does stand as a obstacle to the Congressional purpose of promoting arbitration. See Saturn Distrib. Corp. v. Williams, 905 F.2d at 725 (statute prohibiting waiver of judicial forum held preempted, despite lack of any reference to arbitration).
The policy underlying c. 186, §15F, is an important one, and the Court does not disregard it. But federal law is supreme, and Congressional policy takes precedence. The federal cases have established that the Congressional policy favoring arbitration applies even in areas involving state policies of similar sensitivity. E.g., Circuit City Stores, Inc. v. Adams, 532 U.S. at 122-23 (employment discrimination); Sec. Indus. Ass’n v. Connolly, 883 F.2d at 1121 (consumer protection).
Patterson argues that the statute merely establishes a “ground” “at law ... for the revocation of any contract,” and thus falls within the exception provided in section 2 of the FAA. The cases, however, have interpreted that exception more narrowly, as encompassing only “generally applicable contract defenses, such as fraud, duress or unconscionability.” KKW Enter., Inc. v. Gloria Jean’s Gourmet Coffees Franchising Corp., 184 F.3d at 50, quoting Doctor’s Assocs., Inc. v. Casarotto, 415 U.S. 681, 687 (1996). Massachusetts law does not recognize a waiver of jury trial as a generally applicable contract defense. The conclusion is inescapable that c. 186, §15F, insofar as it voids the arbitration provision of the 1998 agreement between these parties, is preempted by section two of the Federal Arbitration Act.[9] Accordingly, Piano Craft is entitled as a matter of law to judgment ordering the parties to arbitration.
4. Piano Craft’s Request Under G.L.c. 231, §6F
Piano Craft seeks attorneys fees under G.L.c. 231, §6F. That statute applies where all or substantially all of a party’s claims are “wholly insubstantial, frivolous, and not advanced in good faith.” Patterson’s position here rests on an act of the legislature that carries presumptive validity, and that on its face supports his claim. His claims in this case, although unsuccessful, do not warrant sanction under G.L.c. 231, §6F.
CONCLUSION AND ORDER
For the reasons stated, the Defendant’s Motion for Summary Judgment is ALLOWED, and Plaintiffs Cross Motion for Summary Judgment is DENIED. Defendant’s request for attorneys fees under G.L.c. 2321, §6F, is DENIED. It is hereby ordered that JUDGMENT enter dismissing all counts of the plaintiffs complaint and ordering the parties to proceed to arbitration.

 The parties’ statements pursuant to Superior Court Rule 9A(b)(5) reveal certain disagreements, primarily as to characterization of the contents of documents. Neither party contends that these disagreements constitute genuine disputes of material fact, so as to preclude summary judgment. The Court has disregarded characterizations, and examined the documents themselves.

 The parties have referred to the agreement as a “settlement agreement,” but the record does not identify the nature of the dispute that was settled thereby.

 These provisions are required in all section 8 leases by federal regulation, 24 C.F.R. §982.310(f).

 Patterson makes reference to a letter from a licensed clinical social worker purporting to document his disability and need for accommodation, but he does not provide the letter, and does not claim to have provided it to the landlord. It appears that efforts to provide documentation became stymied by an unsuccessful attempt to negotiate a confidentiality agreement with respect to medical information.

 Yhe complaint sets forth these two grounds for staying arbitration as separate counts.

 The defendant’s motion also seeks attorneys fees and costs under G.L.c. 231, §6F.

 His assertion of such an argument may put the arbitrator in the position of construing c. 15 IB. Arbitrators are competent to do so, and agreements to arbitrate claims under c. 151B and comparable statutes are enforceable. See Mugnano-Bornstein v. Crowell 42 Mass.App.Ct. 347, 351-53 (1997) (enforcing arbitration agreement with respect to c. 151B claim); Bercovitch v. Baldwin School, Inc., 133 F.3d 141, 147-49 (1st Cir. 1999) (enforcing arbitration agreement with respect to claim under Rehabilitation Act), and cases cited.

 Patterson expresses no disagreement with Piano Craft’s assertion that the transaction underlying the 1998 agreement involves commerce for purposes of this provision, by virtue of Piano Craft’s expenditures in commerce in connection with operation of the building.

 The narrow scope of this holding bears emphasis. The involvement of commerce is not disputed here, as it likely would be in other circumstances of residential landlord-tenant relationships. Moreover, the Federal Arbitration Act has no bearing on jury waiver or other dispute resolution provisions that do not provide for arbitration.